## PARKER v. BROWN.

### (Circuit Court of Appeals, Eighth Circuit.  February 7, 1898.)

### No. 946.

1. CONFLICT OF LAWS—TRANSFERS OF PERSONAL PROPERTY.
   The fiction of law that personal property has no situs except that of the owner must yield when the policy and law of the state where it is actually located have prescribed a different rule of transfer from that of the state where the owner resides.

2. SAME—ASSIGNMENTS FOR BENEFIT OF CREDITORS.
   An assignment for benefit of creditors, made by one residing in Iowa, is governed, as to property located in Kansas, by the Kansas voluntary assignment law, prescribing the manner of registration and the effect thereof as notice.

3. SAME—CHATTEL MORTGAGES.
   A creditor who takes and has recorded a chattel mortgage on goods in Kansas after the owner has made a general assignment for benefit of creditors in Iowa, but before the deed is recorded in Kansas, and without actual notice of the making of the assignment, obtains a prior right.

4. PARTNERSHIPS—AUTHORITY OF PARTNERS—ASSIGNMENT.
   One partner has no authority to make a general assignment of the partnership property for the benefit of creditors except by the express consent of all the partners.

5. WITNESSES—EXAMINATION—LEADING QUESTIONS.
   On a question whether one partner authorized the other to make an assignment, the former was asked by his counsel to relate the conversation between them. He thereupon detailed a conversation about raising money to meet their debts, but said nothing about an assignment. He was then asked whether anything was said about an assignment, and answered that he did not remember, but did not think there was. His counsel then asked whether the assignment was made with his consent, to which he replied, "Certainly it was." *Held*, that these questions were leading, and the method of examination improper.

In Error to the Circuit Court of the United States for the District of Kansas.

Prior to January, 1883, J. H. Engle was engaged in general merchandise business at Hamburg, Iowa. His son, John R. Engle, who had recently attained his majority, was engaged as a clerk in 1892 in a business house at St. Joseph, Mo. According to the testimony of J. H. Engle, he concluded to admit his son into a general partnership in his business at Hamburg. Whether or not the son was in fact admitted into co-partnership in the business at Hamburg is by no means clear, in view of the attending circumstances, and a want of any overt act of the parties evidencing such association. About March, 1893, the son was sent to Gaylord, Kan., with a stock of goods selected out of the Hamburg store, and opened a house at Gaylord under the firm name of J. H. Engle & Son. The son thereafter resided at Gaylord, and had personal charge of the conduct of the business there. J. H. Engle continued his residence and business at Hamburg as theretofore under the name of J. H. Engle, occasionally visiting Gaylord for a few days. This adventure at Gaylord proved unsuccessful, so that by July, 1893, the concern was in a failing condition. On the 15th day of July, 1893, the concern owed the plaintiff in error, a banker at Gaylord, for borrowed money, the sum of $438.70. About that time J. H. Engle visited the house at Gaylord, to look into the condition of its affairs. Their creditors were becoming restive and urgent. Plans of relief were discussed between the Engles. Among other things, it was agreed that J. R. Engle should see Parker, and try to secure an additional loan. J. H. Engle returned to Hamburg, Iowa, about the 16th day of July with the understanding that he would see what he could accomplish in the way of raising sufficient money there to tide over the business. On the 17th day of July, J. R. Engle, failing to obtain a further loan

from Parker, telegraphed J. H. Engle, at Hamburg, of this failure, and suggested to him to try to secure a loan from the bank there. On the same day the son, under the pretense that he had bought out the interest of his father in the business at Gaylord for the sum of $3,000, executed to his father a chattel mortgage on the entire stock of goods at Gaylord to secure the payment of said alleged purchase money 90 days after date, and placed this mortgage on record in Smith county, where he resided, and the goods were located. On learning of this conveyance, Parker and other creditors demanded of J. R. Engle security for their claims against the firm. One of the creditors brought an attachment suit. On the 19th of July, J. R. Engle, for himself and the firm, executed to Parker and other creditors separate chattel mortgages on said goods at Gaylord to secure debts of the firm, which mortgages were duly recorded in said Smith county on said day, the Parker mortgage having priority in point of time over the other mortgages. Pursuant to the provisions of the mortgage, Parker took immediate possession of the property. On the evening of July 17th, J. H. Engle, at Hamburg, Iowa, executed in the name of J. H. Engle & Son a general assignment of all property for the benefit of all the creditors. This deed was recorded in Fremont county, Iowa, the county in which J. H. Engle resided, on the 18th day of July. On the 22d day of July, Edward Sudendorf, the assignee, appeared in Kansas, and placed on record in Smith county this deed of assignment. Sudendorf failing to qualify as such assignee, by giving bond as required by the statutes of Iowa, the defendant in error, George H. Brown, was appointed and qualified as such assignee in Fremont county, Iowa. On October 10, 1893, this action was instituted by said Brown, assignee, against Parker, in the United States circuit court, to recover damages amounting to $10,000 for the wrongful taking and conversion of said stock of goods at Gaylord. On trial to a jury the plaintiff therein recovered judgment, to reverse which Parker sued out a writ of error to this court. Other special facts are sufficiently noted in the following opinion.

Webb McNall, for plaintiff in error.

George E. Stoker (Charles J. Dobbs, on the brief), for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

Without taking up seriatim the many assignments of error in this record, the more important and decisive questions involved will be considered. At common law, a general assignment of all the property of the debtor for the benefit of all creditors operates as a transfer of the title of the assignor to the assignee of the entire assets of the debtor from the instant of the delivery of the instrument of conveyance and the possession of the property to the assignee. As personal property, at common law, has no situs separate from the domicile of the owner, such general assignment, valid by the law of the domicile, is, by comity, good in every other jurisdiction, and will be respected and enforced in the forum according to its effect under the law of the place of contract. But, as held by controlling authorities, this fiction of law is by no means of universal application. It yields whenever it is necessary for the purpose of justice that the actual situs of the thing should be examined. This fiction also yields "when the policy and law of the state where the property is located have prescribed a different rule of transfer from that of the state where the owner resides, and to this are all the authorities." Green v. Van Buskirk, 7 Wall. 150; Warner v. Jaffray, 96 N. Y. 255. In Green

v. Van Buskirk, supra, A., a citizen of New York, was indebted to B. and C., also citizens of New York. A., having certain personal property in the state of Illinois, gave B. a mortgage thereon to secure his debt. Before the mortgage was recorded in Illinois, or the property was taken possession of by B., such record and delivery of the property being necessary under the laws of Illinois, but not by the laws of New York, to the validity of the mortgage against third parties, C. brought an attachment suit in the state of Illinois, and seized the property there under writ of attachment, and prosecuting this proceeding to judgment, sold the property thereunder. Afterwards the mortgagee brought suit against C., in the state of New York, for conversion of this property, to which action C. pleaded in bar said proceedings in Illinois. The New York court held that, as the mortgage was valid under the laws of the state of New York, the domicile of the owner of the property, it was effectual to pass the title to the property in Illinois, and that B., by his attachment proceeding, acquired no greater right thereto than the mortgagor had, and gave judgment in favor of the mortgagee. On writ of error to the supreme court of the United States this judgment was reversed, the court holding that:

"The liability of property to be sold under legal process issuing from the courts of the state where it is situated must be determined by the laws there, rather than that of the jurisdiction where the owner lives. These decisions rest on the ground that every state has the right to regulate the transfer of property within its limits, and that whoever sends property to it impliedly submits to the regulations concerning its transfer in force there, although a different rule of transfer prevails in the jurisdiction where he resides. He has no absolute right to have the transfer of property lawful in that jurisdiction respected in the courts of the state where it is found, and it is only on a principle of comity that it is ever allowed. But this principle yields when the laws and policy of the latter state conflict with those of the former." Justice Davis in Hervey v. Locomotive Works, 93 U. S. 671.

In Warner v. Jaffray, supra, is an interesting and instructive discussion of this question. In that case there was a general assignment pursuant to the laws of New York by the owner domiciled there. The assignor owned property situated in the state of Pennsylvania, which, after the assignment, and before taking possession of the property by the assignee, and before the assignment was recorded, was levied upon under a writ of attachment by a creditor, a resident of the state of New York. It was held that the property passed to the assignee, subject to the lien thus acquired by the attachment, as by the law of Pennsylvania regulating assignments by nonresidents such instrument took effect at the time of its date, only in case no bona fide purchaser, mortgagee, or creditor had a lien thereon in the same county, and having no previous actual notice thereof. Earle, J., inter alia, said:

"The assignment was a mere voluntary conveyance, and can have no greater effect, so far as passing title to the property assigned, than any other conveyance. It did not operate upon the creditors of the assignor, nor place them under any obligation. It left them entirely free to act. They could utterly refuse to have anything to do with it, and retain their claims, and enforce them in their own time as best they could against their debtor. The assignee became a trustee for such creditors of the assignor only as chose to accept him as such, and without their assent the assignment did not bring the creditors

into any relation with the assignee or with each other. The law did not take this insolvent's property for distribution among his creditors, but its distribution was his own act. Any one of his creditors could, notwithstanding the assignment, enforce his claim against any of the property of the assignor not conveyed by the assignment, without violating any rights or equities of the other creditors. Equity does not condemn the efforts of one creditor to secure the payment of his claim, even if, in consequence of such efforts, nothing should be left for other creditors. On the contrary, the vigilant creditor has always been rewarded for his vigilance. Therefore the sole right of this plaintiff to maintain this action must rest upon the fact that the title to the property situated in Pennsylvania passed to him by the assignment before it was attached by the defendant. It is clear upon authority that the title did not pass."

He then proceeds to discuss the proposition that this property, having a situs in the state of Pennsylvania, was subject to its laws respecting the transfer of property, and, as they were different from those of the laws of the state of New York, where the mortgage was made, the rights of the parties to the property in question were determined by the laws of the state of Pennsylvania.

It was conceded at the hearing by counsel for the defendant in error that the assignment in question was subject to the laws of the state of Kansas respecting the transfer by deed of property situated therein, and the recording laws of the state. While the provisions of the Iowa statute are like those of the state of Kansas in the particular that such assignments must be for the benefit of all the creditors of the estate pro rata, and in respect to the necessity of the acknowledgment of such instruments, they differ in some important respects. For instance, under the statute of Iowa such instrument must be recorded either in the county of the residence of the assignor or in the county where the property is situated. The statute of Kansas requires that such instrument shall be recorded in the county where the property is situated. The statute of Kansas is also different from that of the state of Iowa in respect to its recording laws, and the effect of such conveyance before filing it for record, and the like. The following are the provisions of the statute of Kansas respecting assignments and recording the same:

"Section 1. Every voluntary assignment of lands, tenements, goods, chattels, etc., made by a debtor to any person in trust for his creditors, shall be for the benefit of all the creditors of the assignor in proportion to their respective claims; and every such assignment shall be approved or acknowledged and certified and recorded in the same manner as is prescribed by law wherein real estate is conveyed." (Gen. St. 1897, c. 111.)

"Sec. 19. Every instrument in writing that conveys any real estate or whereby any real estate may be affected, proved or acknowledged and certified in the manner hereinbefore prescribed, may be recorded in the office of the register of deeds of the county in which such real estate is situated.

"Sec. 20. Every such instrument in writing, certified and recorded in the manner hereinbefore prescribed, shall from the time of filing the same with the register of deeds for record, impart notice to all persons of the contents thereof; and all subsequent purchasers and mortgagees shall be deemed to purchase with notice.

"Sec. 21. No such instrument in writing shall be valid, except between the parties thereto and such as have actual notice thereof, until the same shall be deposited with the register of deeds for record." (Id. c. 117.)

It will be observed that under the provisions of said section 20 it is only purchasers and mortgagees who become such subsequent to

the recording of the instrument that "shall be deemed to purchase with notice," while section 21 declares expressly that such instrument in writing shall not be valid except between the parties thereto, and such as have actual notice thereof, until the same shall be deposited with the register of deeds for record. Therefore, when Parker took his mortgage, the unrecorded assignment, as to him, was as if it had never been written, unless it is made to appear that he had actual notice of the assignment at the time he took his mortgage. The testimony on his behalf was that he knew nothing of the existence of this assignment when he took his mortgage, while J. R. Engle testified on behalf of the plaintiff below that Parker had such notice. But this question of fact the trial court did not submit to the jury.

The sole contention of counsel for the defendant in error to justify the action of the trial court is that, before Parker can justify his taking of the property under his mortgage, it should appear that at the time of taking the same he parted with something of value, gave some new consideration, and that he is not a purchaser or mortgagee within the protection of the statute where the debt secured is a preexisting debt. In support of this contention reference is made to the cases of Forwarding Co. v. Mahaffey, 36 Kan. 152, 12 Pac. 705, and Burke v. Johnson, 37 Kan. 337, 15 Pac. 204. The questions there presented were only as to the effect of an attachment placed upon the property after the making of the mortgage, in one case, and a sale of the property, in the other case, before the conveyances were placed on record. It was held that, as the attaching creditor only seized whatever interest the debtor then had, and could sell nothing more, and the purchaser thereunder could only acquire whatever interest the debtor then had, he merely became substituted to the rights of the mortgagor or grantor, and therefore acquired nothing as against the antecedent mortgagee or vendee. Such attaching or execution creditor is not a purchaser or mortgagee. The purchaser or mortgagee, under section 21 of the Kansas statute, acquires absolutely the apparent interest, in contradistinction to the real interest, of the debtor, and the unrecorded instrument, as to him, if he has not actual notice of the prior conveyance, is declared by this statute to be invalid. This precise question, in effect, has been passed upon by the supreme court of Kansas in Hayner v. Eberhardt, 37 Kan. 308, 15 Pac. 168. In that case one of the parties to the controversy claimed under a prior unrecorded mortgage and the other under a subsequent mortgage, but first recorded, without actual notice to the subsequent mortgagee at the time of the pre-existing rights of the first mortgagee. The second mortgage was taken to secure a pre-existing debt alone. The court, after referring to the sections of the Kansas statute above noted, held that the second mortgage was the better claim. The court said:

"The evident purpose of these two sections of the statutes is so plainly expressed by the legislature that there is no room for construction, and under any known rule of interpretation there are no exceptions to its operation but such as are therein created by notice of the existence of a prior mortgage, and probably such notice as possession by some other person than the mortgagor might impart. All outstanding equities of which the mortgagee had no notice at the

time of the execution and delivery of the mortgage are rendered subordinate to its lien by the act of recording. This statute, with some variation of phraseology, has been in force ever since the third year of our territorial existence, and has resulted in a plain, easy, and practical method by which title to land and written instruments affecting real estate can be determined by men of ordinary intelligence in almost every case, with that reasonable certainty that is so much to be desired. To hold now that the lien of a recorded mortgage should be postponed in favor of an unrecorded one, for the sole reason that the consideration of the recorded instrument was an antecedent debt, would not only antagonize the policy of the statute, but would misinterpret the plain language by which that policy is expressed. It is a wise state policy that sweeps away the accumulated cobwebs of an obsolete system that hang about the muniments and are entwined around the chains of the titles to real estate within its borders, and adopts a plain, easily understood, and perfectly just rule of public registration, founded upon the maxim, 'First in time, first in right,' qualified by notice of the existence of other liens, and the rights of a party in possession. Jackson v. Reid, 30 Kan. 10, 1 Pac. 308; Lewis v. Kirk, 28 Kan. 497."

Without setting out the instructions given and refused by the court to which exceptions were duly taken, it is sufficient to say that the court in explicit terms directed the jury, as disclosed by the record before us, to return a verdict for the plaintiff below, if they found from the evidence that the assignment was made by the consent of J. H. Engle & Son, in the state of Iowa, conformably to the provisions of the laws of that state, notwithstanding the fact that they might find from the evidence that the mortgages in question were given by J. R. Engle, in behalf of the firm, on the property in the state of Kansas, and placed on record before the mortgagees had notice in fact of the assignment in Iowa, and before the Iowa assignment was filed for record in Kansas. This was error; for, unless Parker had actual notice of the Iowa assignment at the time he took and filed for record the mortgage in question, he was prior in time, and prior in right, according to the ruling of the supreme court of that state.

In the event of another trial of this cause, another important question presented by this record should be disposed of. In the case of a co-partnership one partner has no such right of disposition of the partnership property as to enable him, sua sponte, to make a general deed of assignment. He must have the consent of his co-partner. Havens v. Hussey, 5 Paige, 30; Kirby v. Ingersoll, 1 Har. (Mich.) 172; Id., 1 Doug. (Mich.) 477; Hook v. Stone, 34 Mo. 329; Paul v. Cullum, 132 U. S. 539, 10 Sup. Ct. 151; Loeb v. Pierpoint, 58 Iowa, 469, 12 N. W. 544; Shattuck v. Chandler, 40 Kan. 516, 20 Pac. 225. In so making a deed, whereby the entire property is transferred, vesting the complete dominion thereof in the assignee, thereby working a dissolution of the partnership, the express consent of all the partners thereto is indispensable.

It was a vital question on the trial of this cause whether or not John R. Engle, who was at Gaylord, Kan., when the deed of assignment was made by J. H. Engle at Hamburg, Iowa, had given his consent prior to the making of the deed. This question of fact hinged entirely upon the conversations which occurred between the Engles at Gaylord on or about the 15th or 16th day of July, 1893, on the eve of J. H. Engle's departure for Hamburg. Counsel for the plaintiff below, appreciating the importance of making this proof,

as it lay at the very foundation of the assignment, introduced J. R. Engle as a witness, and the following examination occurred touching this issue:

"Q. What, if anything, did you and your father talk about in regard to making an assignment, if anything? A. My father said, if we could not get the money from Mr. Parker— Q. (interrupting). State the conversation, I mean, Mr. Engle. A. We had a conversation that he should do his best to get the money at Hamburg. By Mr. McNall: We object to the testimony unless he tells what was said, and who said it. By the Court: Tell the substance of it. A. He was to go to Hamburg, and get the money, if he possibly could, and, if he could not, whatever he should do it would be all right with me; would be with my sanction."

Counsel for plaintiff below evidently recognized that, as matter of law, this was not sufficient to vest the authority in J. H. Engle to make an assignment of the partnership assets when he returned to Hamburg, as the necessary inference therefrom would be that, as his declared mission was to raise money to enable them to ease up the pressure of creditors, his power of attorney was limited to ."whatever he should do" in the matter of raising money. Therefore counsel pressed the inquiry further as follows:

"Q. Was anything said there at that time between you and him about making an assignment by him or by you? By Mr. McNall: I object to the question as leading; he has led the witness up to the conversation and should ask him to state it. (The court overruled the objection, to which ruling of the court the defendant at the time duly excepted, and still excepts.) A. I do not just remember whether he did or did not. I don't think there was. I don't remember whether there was or not. Q. Did he afterwards make an assignment? A. Yes, sir. Q. You may state whether or not that was with your consent. (Mr. McNall on behalf of the defendant objects to the question as leading. The court overruled the objection to which action and rule of the court the defendant at the time duly excepted and still excepts.) A. It certainly was."

This course of examination, of so willing a witness as the record shows this one to be, was most vicious. He was first led, in a way, not only to indicate to him the answer sought for, but, when restrained to state what the conversation in fact was, counsel was permitted to ask him directly whether anything was said about making an assignment, and receiving a direct answer, not only that the witness did not remember, but "I don't think there was," he was then indulged to ask witness if the assignment was with his consent, and the witness was permitted to answer, "It certainly was." Such answer was not only a usurpation by the witness of the province of the jury, as being a mere conclusion, but left it uncertain whether this consent was given before or after the execution of the deed of assignment, or even as to how this consent was expressed. The fact of consent was to be found by the jury alone from what transpired between the Engles before the departure of J. H. Engle for Hamburg. This consent could not rest alone in the mind of J. R. Engle, but, if found by the jury to have been given, it must be on evidence showing that John R. Engle, by words expressed prior to the 17th day of July, authorized J. H. Engle to make an assignment of the partnership assets. And the court should, by proper instruction, advise the jury as to how such consent should have been given, as

applied to the facts of the case. It is true that the ground of objection assigned by counsel to the last question was not technically exact, as the question called for a mere conclusion of the witness. But taken in connection with all that immediately preceded, the vice in the mode of examination was sufficiently noted as leading. 1 Greenl. Ev. § 434, under the head of "Leading Questions not Permissible," enumerates questions which suggest to the witness the answer desired; questions which admit of an answer by a simple negative or affirmative, and that witnesses, except in specified cases, should be examined only as to matters of fact, whether they consist of words or actions, and also that the rule inhibits inferences or conclusions which may be drawn from facts, as they belong ordinarily to the jury alone. This witness was, in effect, coerced into saying that he consented to the assignment, when, had he testified directly that in the conversation between him and his father the matter of an assignment was discussed, he would have exposed himself to a prosecution for perjury. On cross-examination, the following occurred:

"Q. Now, what did your father say to you on the 15th—Saturday—night, and what did you say to him concerning your business relations? A. He said that we must get some money to meet our obligations, and that I should see Mr. Parker when he returned Monday, and that he would go to Hamburg, and if I could not get it he would try and get the money at Hamburg, Iowa. Q. Was that all that was said? A. That was the sum and substance of it. Q. Nothing further was said? A. I don't remember anything. Q. You have now detailed the entire conversation, or the substance of it, that you and your father had on the night of the 15th? A. That is all I remember."

Not only this, but in a former deposition given by this witness in this case, he not only detailed all the conversation that occurred between him and his father on the eve of the latter's departure for Iowa, in which no reference was made to the subject of an assignment, but to the direct question, "There was nothing said at this time about his making an assignment, was there?" he answered, "No, sir." More than this, the entire conduct and declarations of this witness up to the 18th of July demonstrate absolutely that the idea of an assignment had never occurred to him, until advised that day by telegram from his father. It is also apparent that J. H. Engle himself was, by a like vicious leading examination, made to state that the term "assignment" was employed between him and his son in the conversation in question. Time and again, and especially on cross-examination, he detailed what he deemed the entire conversation between them, which did not include a word about an assignment, and, but for being prodded by counsel in leading questions, the needed answer might not have been obtained. Other assignments of error need not be discussed, in view of the conclusion of law affecting the merits of this case reached herein. It results that the judgment of the circuit court is reversed, and the cause is remanded, with directions to grant a new trial and for further proceedings in conformity with this opinion.